RAWDON and GROESBECK v. R. M. BLATCHFORD, Receiver of
the Commercial Bank, and others.

R. borrowed money of the complainants and secured it by the transfer of stocks.
He was then the cashier of a bank, and so continued till after its failure. On its
failure, it turned out that he had plundered the bank of a large sum, and was
insolvent. While this was known to the bank commissioners only, he obtained
the stock from the complainants without consideration, and on a representation
that he wanted it for a particular purpose and would replace the security. He
withheld from them information of his defalcation, and the purpose for which he
wanted the stock, which was to transfer it to the bank, and prevent a public
disclosure. On obtaining the stock, he immediately transferred it to the bank.
Held, that R.'s concealment of his situation, and his object in the proceeding, was
a fraud upon the complainants; and that the bank could not retain the stock upon
its demand against him.
    Feb. 12, 20 ; Feb. 29, 1844.

ON the 1st of May, 1841, the complainants loaned to R. W.
Redfield, $4100, to be repaid on demand, with interest; and
he delivered to them, as collateral security, 200 shares of the
stock of the Williamsburg Fire Insurance Company, and 200
shares of the stock of the Hudson Fire Insurance Company.

Redfield was at that time the cashier of the Commercial Bank
in the city of New-York, and continued to be such cashier till
after its failure. Previous to that event, he had plundered the
institution of about $56,000, (which fact was unknown to any
person except himself,) and he was largely insolvent. The
bank was closed on the 27th of September, 1841, by an injunc-
tion issued upon the application of the Bank Commissioners;
and on that day Redfield disclosed his defalcation to three of
those officers. It was not communicated to others, until about
two weeks afterwards, and Redfield continued during that in-
terval, to officiate in the bank.

On making the disclosure to the Commissioners, he proposed
to secure the bank, if they would keep his misconduct secret.
They declined to make any such promise, but suggested that
he should go to his friends and get them to assist him in se-
curing his indebtedness to the bank, communicating to them

the fact of his defalcation. He told them it would be out of his power to effect this, unless the matter was kept a secret; and he believed from their expressions that they would not divulge it, if he secured the bank. In fact, Redfield was insolvent, and unable to make the bank secure, unless at the expense of some other person.

Two days after this, for the purpose of aiding in providing for the bank debt, and thus screening himself from the public disclosure of his guilt, he applied to the complainants and obtained the 200 shares of Hudson Fire Insurance stock, representing that he wanted it for a particular purpose, and agreeing to replace it by other security. He immediately transferred the stock to the Commercial Bank, with the knowledge of the Bank Commissioners, and placed the certificate among the papers and securities of the bank. The transfer became known to some of the directors within a few days, but there was no formal action in regard to it.

When he obtained the stock from the complainants, the fact of his being a defaulter was still unknown. He did not inform them of this fact; or of the purpose to which he intended to devote the stock.

Soon after this, the secret leaked out, and it was out of the power of Redfield to replace the stock or otherwise to secure the complainants.

Neither the Bank Commissioners, or the officers of the bank, ever actually accepted the stock, or made any application of it upon Redfield's deficiency. Mr. Blatchford was appointed Receiver of the bank, and found the stock among its assets. The complainants demanded the same from him, and he declined to deliver it to them. After applying the value of the Williamsburgh Fire stock, the whole of the Hudson Insurance stock would be insufficient to pay the complainant's debt.

They thereupon filed their bill to compel a return of the stock. Redfield and his assignees were made parties, but did not defend. The cause was heard on pleadings and proof.

*W. Judson*, for the complainant.

*E. H. Blatchford,* for the Receiver.

THE ASSISTANT VICE-CHANCELLOR.—On the state of facts established in this case, I think the complainants are clearly entitled to the stock in question. Assuming that the deposite of the scrip by Redfield, and the subsequent action upon it, amounted to an acceptance of the stock by the bank; they took it for a precedent debt, and subject to the equity of the complainants to have it restored to them, if it turned out that such equity existed. *Keeler* v. *Field,* (1 Paige's R. 312.) *Root* v. *French,* (13 Wend. 570.)

It was argued that Redfield obtained the stock from the complainants in good faith, because he testifies that he fully intended to fulfil his promise to them, and believed that he was solvent; and it is said that there was no intent on his part to defraud them, and that no fraud is established.

It by no means follows that Redfield acted in good faith, from this testimony. If he intended to replace the stock, he probably deceived himself, as he did those with whom he negotiated.

He was perfectly desperate at the time, and grasping at every straw to save his drowning reputation. Whether so intended or not, it was a gross fraud upon the complainants.

While the secret of his defalcation was kept, he was running at large, virtually endeavoring, by robbing others, to make good his delinquency to the bank, and shield himself from infamy if not from punishment.

If he had told the complainants that he was a defaulter to the bank, and wanted this stock to turn out to the institution, no one supposes for a moment that they would have permitted him to take it. His concealing these facts was of itself a fraud upon them. They acted upon the supposition that he was in good standing, and able to make them secure. They relied upon his integrity and good faith, in delivering up their security, and receiving his naked promise to replace it ; when he knew perfectly well that he was destitute of both faith and honesty, and that he was possessed of conclusive evidence of that destitution of which they were utterly ignorant.

Chancellor Kent says, " if there be an intentional conceal-

ment or suppression of material facts in the making of a contract in cases in which both parties have not equal access to the means of information, it will be deemed unfair dealing, and will vitiate and avoid the contract." (2 Kent's Comm. 482, 2d ed.) And Mr. Justice Story, in his Commentaries on Equity, places the ground of relief in such cases, as well on the ignorance or mistake of material facts known to the one party and not to the other, as upon the unconscientious advantage taken of the latter by the concealment of them. (1 Story's Eq. 160.)

In *Durell* v. *Haley*, (1 Paige's R. 492,) the Chancellor held that if a purchaser who is insolvent, concealing his insolvency from the vendor, obtains goods from him without intending to pay for them, it is a fraud upon the vendor, and the property in the goods will not be changed.

In *Lupin* v. *Marie*, (2 Paige's R. 169,) he says that if a merchant in good credit purchase goods upon his own responsibility, who knows himself to be insolvent at the time, but conceals that fact from the vendor, for the purpose of placing them in the hands of an assignee for the benefit of other creditors, it would be such a fraud as would avoid the sale.

This is precisely what Redfield did in this case. Not that he knew he was insolvent, but he knew facts which he concealed, and which would if disclosed, have been even more fatal to his application for the stock.

And see *Livingston* v. *Peru Iron Company*, (2 Paige's R. 390.)(a)

Upon well settled equitable principles, to say nothing of honesty and fair dealing, the stock was fraudulently procured from the complainants, and it must be restored to them.

The Receiver was probably justified in resisting the claim for their benefit, as between himself and his beneficiaries. His costs and those of the complainants will be paid out of the fund in his hands.

---

(a) And *Martin* v. *Morgan*, (3 J. B. Moore's R. 635.)