SARGENT *v.* USHER.          { MARCH 13, 1875.

*Agister's lien.*

| 55 | 287 |
| 67 | 363 |
| 68 | 32 |

A mortgagor of horses cannot, without the knowledge, acquiescence, or consent of the mortgagee, express or implied, " entrust " the horses to be boarded so as to subject them to a lien for their keeping—under Gen. Stats., ch. 125, sec. 2—as against the mortgagee.

TROVER for two horses. Writ dated March 31, 1874. Plea, the general issue. Trial before RAND, J., September term, 1874. The horses were taken at the plaintiff's barn, in Nashua, March 25, 1874, by the defendant, under two mortgages given by George E. Robinson, one to the defendant, October 27, 1873, duly recorded October 28, 1873, the other to one Charles W. Glidden, dated November 27, 1873, recorded

November 28, 1873, and duly assigned to the defendant, January 23, 1874. The parties to these mortgages, and the horses, were all of Malden, Massachusetts, at the time of the execution of said mortgages, and the mortgages and notes secured thereby were executed in Massachusetts. Either party may refer to said mortgages and the assignment in the argument. It appeared in evidence that said Robinson came with said horses to Nashua from Malden, about December 6, 1873, and made a contract with the plaintiff to board these horses at seven dollars per week: the horses remained at said Sargent's until March 25, 1874, when they were taken by the defendant under said mortgages: said Robinson boarded at said Sargent's, and, until a few days before the horses were taken, used the horses in hauling wood and timber for the plaintiff and one Humphrey, as partners, and sometimes twice a week in the evening driving out parties, and once in driving to town-meeting: said Robinson, while so using the horses, fed and took most of the care of them. During all said time the horses, at night, and when not so in use, were kept in the barn of the plaintiff, and he supplied them with food and took care of said barn. There was evidence tending to show that for a few days previous to the taking of the horses the plaintiff had them in his exclusive possession, boarded them, and took the sole and exclusive care of them, for which he has received no pay ; and that said Sargent and Humphrey, a few days before the horses were taken, settled with said Robinson, and found that, after charging him with his own board, the board of his brother, a sled, and small sums of money advanced to him, they had overpaid him nearly fourteen dollars, which he still owes them; and he then ceased working for them and using said horses.

In January or early in February, before taking the horses, the defendant went to Sargent's in Nashua, saw the horses at Sargent's, but said nothing of their being mortgaged until the day he took them. A demand was made by the defendant on Robinson for the mortgage debt, which was not paid. The court instructed the jury that the lien of the plaintiff, if there was one, was of prior right to the mortgagee under the mortgages ; that the lien would be created in favor of the plaintiff as against the defendant's mortgages, if the horses were entrusted to the plaintiff to be boarded ; that the word *entrusted*, used in the statute, had the ordinary meaning. The court was requested by the defendant to instruct the jury that if said Robinson had the possession and use of said horses while they were being boarded or kept at Sargent's, during such time Sargent would lose his lien because the possession of the property should be in Sargent during such keeping ; but the court declined, and repeated the instruction already given. The court were also requested by the defendant to instruct the jury that there was no evidence in the case upon which the jury could find that the horses were entrusted to the plaintiff to be boarded; but the court declined. The jury found a verdict for the plaintiff, and assessed the damages at $116.00, the amount due the plaintiff for board of said horses.

The defendant excepted to the ruling and instructions of the court, and the case is reserved and transferred for the opinion of the superior court. If this action can be maintained for the full amount of the board of the horses, judgment is to be rendered upon the verdict; if for no part of said board, judgment is to be rendered for the defendant; if only for the few days' board subsequent to the settlement, there is to be a new trial to ascertain the value of that board, unless the parties can agree upon the value.

*A. W. Sawyer, Stevens & Parker*, for the defendant.

*Fassett, Wadleigh & Wallace*, for the plaintiff.

LADD, J. The general property in the horses, carrying with it the right of possession, was in the defendant by virtue of the mortgages, subject of course to the right of redemption in Robinson—*Leach v. Kimball*, 34 N. H. 568, *Brackett v. Bullard*, 12 Met. 308, 4 Kent's Com. 138, and *Bank v. Jones*, 4 N. Y. 497; and it is clear that, so far as regards any supposed power of the mortgagor to defeat this right of possession, and, in effect, abrogate this right of property by subjecting it to a lien, he stands in no different position from that of a bailee. The only question in the case, then, appears to be, whether the statute giving a lien for the agisting of cattle, &c., is capable of such a construction as will permit any one having in his possession the animals of another to subject them to a lien for their keeping as against the owner, without his knowledge, acquiescence, or consent, express or implied. And I am of opinion that it is not.

The act provides that "Any person, to whom any horses, cattle, sheep, or other domestic animals shall be entrusted to be pastured or boarded, shall have a lien thereon for all proper charges due for such pasturing or board, until the same shall be paid or tendered." Gen. Stats., ch. 125, sec. 2.

Now, if the whole construction of this act be made to turn on the word "entrusted," it undeniably follows that it makes no difference how the person entrusting animals to be boarded or pastured came by them, nor what his right to them is. A thief, a bailee, and an absolute owner are in this respect all put on the same footing. A sale of stolen goods by the thief passes no title against the owner, and the same is in general true with respect to a sale by a bailee, unless he has been so clothed with the *indicia* of title by the owner, or held out as authorized to sell in such way that the loss ought by reason of his own acts to fall upon the owner rather than on an innocent purchaser. The maxim, *Nemo plus juris in alium transferre potest quam ipse habet*, is one of very general application, and the rule in this country, to which of course there are exceptions, is, that the title of the true owner cannot be lost without his own free act and consent. 2 Kent's Com. 324; *Kingsbury v. Smith*, 13 N. H. 109; *Hyde v. Noble*, 13 N. H. 494; *Farley v. Lincoln*, 51 N. H. 580;—and see quite a forcible

discussion of the whole subject by Senator VERPLANCK, in *Saltus* v. *Everett*, 20 Wend. 267.

The idea that a lien may be created by a contract of the possessor of animals for their keeping, the owner being in no way privy to such contract, when no rights whatever, as against the owner, could be conferred or created by a contract of sale, seems anomalous, to say the least. Such a thing would, as it seems to me, be a violation of the fundamental rights of property guaranteed by the constitution; and if the legislature had undertaken by this act to create a lien, to arise on such a state of facts, I think it would be the duty of the court, as more than intimated by FOSTER, J., in *Jacobs* v. *Knapp*, 50 N. H. 82, to hold the act, so far, unconstitutional and void.

But I do not think any such intention is to be found in the statute. In giving this specific lien I think the legislature used the word in its legal and generally accepted sense, and that implies same privity between the owner, or person having the right of disposing of the goods, and him in whose favor the lien is claimed; and that by "entrusted" is meant entrusted by the owner or other person having authority to pledge the animals for such a purpose,—that is, to suspend the owner's right of possession until the charges are paid.

Cases where it has been held that a common carrier, who innocently receives goods from a wrong-doer, without the consent of the owner, express or implied, has no lien upon them for their carriage as against such owner, seem to cover the whole ground and more.   2 Redf. Railw. 171; *Robinson* v. *Baker*, 5 Cush. 137; *Stevens* v. *B. & W. Railroad*, 8 Gray 262.   The recent English case of *Threfall* v. *Boswick*, Law Rep., 7 Q. B. 711,* has reference to an inn-keeper's lien, and, in my judgment, is not applicable to the case before us here.

The whole reasoning of FOSTER, J., in the carefully-considered opinion of the court delivered by him in *Jacobs* v. *Knapp*, is against the position of this plaintiff; and that case must, as it seems to me, be regarded as quite a direct authority upon the question raised in the present.

Upon these views it is obvious that the plaintiff is not entitled to recover, upon the facts stated in the case; and the ruling and charge of the court, under which his right to recover was made to depend upon whether or not the horses were entrusted to him to be boarded, without reference either to the defendant's right and interest in them as mortgagee, or the nature and extent of Robinson's right and title, cannot be sustained.

CUSHING, C. J. It does not appear from the case that any question is made about the validity of the defendant's mortgages, or of his general right to the possession of the property; and, in the absence of any intimation to the contrary, I shall assume that not only the legal right of property, but, as against Robinson, the right of immediate possession,

---

*S. C. Law Rep. 10, Q. B. 210, published since this decision was announced.

was in the defendant, so that two questions arise in the case. 1. Had any lien been created as between the plaintiff and Robinson, and to what extent? 2. If so, was the defendant bound by it?

It appears from the case that Robinson employed the plaintiff to board the horses at seven dollars per week, and that during a considerable part of the time he was hauling wood and timber for the plaintiff.

There is nothing in the case tending to show that Robinson was in any way employed as the servant of the plaintiff. He was paying for his board as well as for the board of his horses, and the evidence tends to show that he really had the exclusive care and possession of them during all the time that he was hauling wood and timber for the plaintiff.

There was no evidence tending to show that during that time the plaintiff had assumed any care or responsibility about the horses, or, in point of fact, had any possession of them. He appears to have furnished stable-room and food, and nothing more, and Robinson appears to have had the whole possession, care, and exclusive responsibility. I think there was no evidence in the case which tended to show that during this time the horses were, in any just sense, *entrusted* to the care of the plaintiff. I cannot see any evidence that he had during this time any more care or responsibility than he would have had if Robinson had fed the horses in his own barn, taking the hay and grain from the plaintiff's barn. It appears to me, therefore, that entirely independently of the peculiar rights of the defendant in the property, to this extent the plaintiff had acquired no lien.

But it appears, also, that there were a few days during which time the plaintiff had the sole care of the horses, and during which time the evidence tends to show, that, as between the plaintiff and Robinson, the horses were entrusted to the plaintiff, within the meaning of the statute,—Gen. Stat. ch. 125, sec. 2; and the question to be determined is, whether, as between the plaintiff and the defendant, Robinson could so entrust the horses to the plaintiff as to interfere with the defendant's rights.

The general principle seems to be perfectly well settled, that in regard to sales of personal property the buyer cannot shift from himself the responsibility of looking to the title to the property. *Caveat emptor, qui ignorare non debuit quod jus alienum emit.* It is also settled that the seller cannot transfer to the buyer any right which he does not himself possess, unless the owner of the property has in some way put it in the power of the seller to assume the appearance of ownership and defraud the purchaser; and that merely entrusting a party with the possession by the owner is not such an act, unless he also in some way gives the party the *indicia* of ownership.

Now there seems no good reason why a party not the owner should be permitted to pledge the property, or create a lien upon it either at common law or by statute, any more than that he should be permitted to sell it. Neither is there any good reason why a person who

is about to establish relations with another out of which a lien would be created should not make the same inquiries which it would be incumbent on him to make if he were going to purchase the property. If Robinson had sold the property to the plaintiff, there would seem to be no doubt that the plaintiff could acquire no more right than Robinson had. Does it make any difference that the plaintiff, in making his contract with Robinson for hauling wood, included in it a bargain to board his horses?

It is true that there are some employments of a public nature in regard to which it has been said that the party has from the nature of his employment no opportunity to make inquiry. Thus, in Bacon's Abridgment, title, Inns and Inn-keepers, D, it is said,—"Inn-keepers may detain the person of the guest who eats, or the horse which eats, till payment, and this they may do without any agreement for that purpose; for men that get their livelihood by entertainment of others cannot annex such disobliging conditions that they shall retain the party's property in case of non-payment, nor make so disadvantageous and impudent a supposition, that they shall not be paid; and therefore the law annexes such a condition without the express agreement of the parties." "If A injuriously take away the horse of B and put him into an inn to be kept, and B come and demand him, he shall not have him until he hath satisfied the inn-keeper for his meat; for when an inn-keeper takes a horse into his keeping, he is not bound to inquire who is the owner of the horse which he is obliged to keep, let him belong to whom it will, and therefore no reason that the inn-keeper should be obliged to deliver him till he is satisfied."

So, in the case of common carriers, it has been sometimes maintained that the common carrier, being obliged to receive and carry goods which are brought to him, has a right to retain them till his charges are paid, whether he receives them from the true owner or not, provided he receives them innocently. To which it has been answered, that the carrier is not bound to receive goods until he has first been paid. It appears to me, however, that the weight of authority is in favor of the doctrine that the common carrier cannot acquire a lien more extensive than the right of his employer. 2 Redf. on Railw., sec. 188, and authorities cited. This doctrine is maintained in *Gilson* v. *Gwinn*, 107 Mass. 126.

It seems clear enough that the cases of the inn-keeper and the carrier are exceptional, and however the law may be held in regard to them, there would be no reason why an ordinary bailee should not be held by the doctrine of *caveat emptor*, and I have seen no case in which it is held otherwise. My conclusion, then, is, that Robinson had not by law any authority to *entrust* the goods to the plaintiff's keeping.

In *Jacobs* v. *Knapp*, 50 N. H. 71, it is held that under ch. 125, Gen. Stats., sec. 14, no lien can be created except in favor of the party who contracts with the owner of the property, and I see no reason why the same construction should not apply to section 2 of the same chapter.

It is claimed in the plaintiff's brief that Robinson ought to be

considered in law as the agent of the defendant; but I have seen no case in which it has been held that a party, who permits another to have possession of his personal property, by so doing in law constitutes that other his agent to sell or pledge that property.

It is suggested also, in argument, that the defendant, when he saw the horses at the plaintiff's barn, was bound to have given notice of his claim; but I do not see that anything had been brought to the knowledge or notice of the defendant of any unlawful or dishonest dealing on the part of Robinson, which made it incumbent on the defendant to put the plaintiff on his guard.

It should be added that, by Gen. Stats., ch. 123, sec. 13, the sale or pledging of property situated as this was is made a penal offence, which would seem inconsistent with the idea that such sale or pledge could pass any title to the vendee or pledgee beyond that of the seller or pledger.

SMITH, J. I am also of the opinion, that, in order to create a valid lien under the provisions of sec. 2, ch. 125, Gen. Stats., in favor of one who takes domestic animals to be boarded, they must be entrusted by the owner, or some person having authority to entrust them, for such purpose. It is a universal principle, that a man's property shall not be taken from him without his consent. The general property in these horses was in the defendant, subject only to be divested by payment to him of the amount due upon the debt secured by the mortgages. As the lien claimed by the plaintiff exists under the above named statute, the case is not strictly analogous to that of an inn-keeper or common carrier. Many of the reasons which govern the decisions in those cases, however, will apply here.

In England the law seems to be, that an inn-keeper has a lien on a horse for his keeping, put up by a guest who had come fraudulently by it from the true owner. And this is put upon the ground that the inn-keeper is obliged to receive the guest and his horse. *Yorke* v. *Grenaugh*, 2 Ld. Raym. 866; *Threfall* v. *Borwick*, Law Rep., 7 Q. B. 711, and cases there referred to.

It is not necessary in deciding this case to inquire whether the English doctrine in regard to an inn-keeper's lien under such circumstances has ever been adopted in this state. The public character of the business of an inn-keeper and of a common carrier may furnish some reason for not applying to them the principle of *caveat emptor*. But the general current of the authorities in this country is against the rule, as established in the case of the *Exeter Carrier*, referred to in *York* v. *Grenaugh*, *supra*, of exempting a carrier from the application of the rule of *caveat emptor*. It is expressly so denied in *Robinson* v. *Baker*, 5 Cush. 137, where it was held that a common carrier, who innocently receives goods from a wrong-doer, without the consent of the owner, express or implied, has no lien upon them for their carriage against such owner. *Fitch* v. *Newberry*, 1 Doug. (Mich.) 1, is to the same point, and is a case carefully considered, and shows a full

examination of the authorities. There are many hard cases, as suggested by Judge FLETCHER in *Robinson* v. *Baker*, *supra*, of honest and innocent persons, who have been obliged to surrender goods to the .true owners without remedy for the money paid; and this is especially true of auctioneers and commission merchants, who have made advances upon goods which they have been compelled to surrender to the rightful owner. But these are hazards to which persons in business are continually exposed.

This plaintiff was not an inn-keeper, nor, so far as the case shows, was he the keeper of a livery or boarding stable, and was therefore under no obligation to take these horses from Robinson to board. Why, then, should not the principle of *caveat emptor*, which is so universally applied to vendees of personal property, and even to the common carrier, be applied to the plaintiff? Why should he not be required to examine the title of Robinson to these horses, as well as persons in other departments of business be required to examine the title of those from whom they purchase? The common carrier, although obliged to receive goods from the true owner for carriage, is not obliged to receive them unless his charges are paid, nor to receive them at all from the wrong-doer; and if he has no lien as against the rightful owner upon goods received from the wrong-doer, much less it would seem ought the plaintiff, who was under no compulsion or obligation to receive these horses, but did receive them voluntarily, to have a lien thereon against the defendant, who was their rightful owner.

The plaintiff's claim to have a lien on these horses is by virtue of the statute, and not at common-law. As Robinson, who undertook to pledge them, had no authority to do so, the defendant was entitled to a verdict. The verdict must therefore be set aside, and, according to the provisions of the case, there must be

*Judgment for the defendant.*